# EXHIBIT A

# Summons and Complaint

Michael Gayan, Esq. (#11135)
m.gayan@kempjones.com
Mona Kaveh, Esq. (#11825)
m.kaveh@kempjones.com
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001

Julie Erickson (*pro hac vice pending*)
julie@eko.law
Elizabeth Kramer (*pro hac vice pending*)
elizabeth@eko.law
Kevin Osborne (*pro hac vice pending*)
kevin@eko.law
ERICKSON KRAMER OSBORNE LLP
44 Tehama Street
San Francisco, CA 94105
Telephone: 415-635-0631
Facsimile: 415-599-8088

*Attorneys for Plaintiffs*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PRIME TRUST, LLC; and DOES 1-10,<br><br>Defendants. | Case No.: A-22-860739-B<br>Dept. No.: 22<br><br><br>**SUMMONS** |

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS. READ THE INFORMATION BELOW.**

**PRIME TRUST, LLC**
**c/o Saltzman Mugan Dushoff, PLLC-CRA**
**1835 Village Center Circle**
**Las Vegas, NV 89134**

1     1.     If you intend to defend this lawsuit, within 21 days after this Summons is served on you

2    exclusive of the day of service, you must do the following:

3     a.     File with the Clerk of this Court, whose address is shown below, a formal written

4    response to the Complaint in accordance with the rules of the Court.

5     b.     Serve a copy of your response upon the attorney whose name and address is shown

6    below.

7     2.     Unless you respond, your default will be entered upon application of the plaintiff and

8    this Court may enter a judgment against you for the relief demanded in the Complaint, which could

9    result in the taking of money or property or other relief requested in the Complaint.

10     3.     If you intend to seek the advice of an attorney in this matter, you should do so promptly

11    so that your response may be filed on time.

12    Issued at the direction of:

13    **KEMP JONES, LLP**                     **CLERK OF COURT**

14                                         11/7/2022

15    */s/ Mona Kaveh*
Michael Gayan, Esq. (#11135)             Deputy Clerk                Date

16    Mona Kaveh, Esq. (#11825)              Regional Justice Center
3800 Howard Hughes Parkway, 17th Floor    200 Lewis Avenue

17    Las Vegas, NV 89169                 Las Vegas, NV  89155

18    Julie Erickson (*pro hac vice pending*)        **Demond Palmer**
Elizabeth Kramer (*pro hac vice pending*)

19    Kevin Osborne (*pro hac vice pending*)
**ERICKSON KRAMER OSBORNE LLP**

20    44 Tehama Street
San Francisco, CA 94105

21

22    *Attorneys for Plaintiffs*

23

24

25

26

27

28

Electronically Filed
11/2/2022 3:44 PM
Steven D. Grierson
CLERK OF THE COURT

Michael Gayan, Esq. (#11135)
m.gayan@kempjones.com
Mona Kaveh, Esq. (#11825)
m.kaveh@kempjones.com
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001

Julie Erickson (*pro hac vice pending*)
julie@eko.law
Elizabeth Kramer (*pro hac vice pending*)
elizabeth@eko.law
Kevin Osborne (*pro hac vice pending*)
kevin@eko.law
ERICKSON KRAMER OSBORNE LLP
44 Tehama Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088

*Attorneys for Plaintiffs*

CASE NO: A-22-860739-B
Department 22

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PRIME TRUST, LLC; and DOES 1-10,<br><br>Defendants. | Case No.:<br>Dept. No.:<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>**Exempt from Arbitration:**<br>Class Action; Amount in Controversy Greater than $50,000<br><br>**Business Court Requested:**<br>EDCR 1.61—Business Tort Claim |

Plaintiffs AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, (collectively, "Plaintiffs"), for their complaint against Defendants PRIME TRUST LLC ("Prime Trust") and DOES 1-10 (collectively, "Defendants"), hereby allege as follows:

1

**INTRODUCTION**

1.      Since the introduction of Bitcoin in late 2008, digital assets have evolved from a technological curiosity into a market of thousands of digital financial instruments used by millions of ordinary Americans. Today, approximately 50 million Americans own some form of digital asset, and that number is growing rapidly.

2.      TerraUSD ("UST") was a cryptocurrency in a class of cryptocurrency referred to as "stablecoins" because, unlike Bitcoin, it was purportedly "pegged" to the U.S. dollar at a rate of one-to-one. It was offered for sale by numerous companies offering digital "wallets," which served the role of interest-earning savings accounts for cryptocurrency investors. When a user deposited UST into their wallet, they could earn interest returns as high as twenty percent annually.

3.      Defendant Prime Trust holds itself out as a trust company and a bank built to facilitate trading in digital markets. Its products enable individual investors to electronically transfer money from their traditional retail bank accounts into the digital asset market where cryptocurrencies like UST are exchanged. As a part of these services, Prime Trust acts as a custodian for investors' assets. It deposits investors' funds into FDIC-insured banks and processes orders to redeem wallet users' digital holdings for dollars when a user sells a digital currency.

4.      Prime Trust also holds itself out as a company that backs stablecoins. According to the company's CEO, "we ensure that the funds are there that back the coin, so anything that's minted, there's a one-to-one. That's what we do as a trust company, we have to do that."

5.      For years, Prime Trust has acknowledged that the stablecoins it held in trust were susceptible to volatility. It claimed its role was to allow investors to fill orders and get their money in the event that there was a run on an asset. As a senior vice president at the company put it in 2018, "if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available. So we do that."

6.      In May 2022, UST began to unravel. On May 9, 2022, it fell from the one-to-one peg with the U.S. dollar to approximately $0.90, causing depositors, including Plaintiffs, to rush to liquidate mass quantities of UST.

7.    Thousands of UST depositors placed sell orders through their wallet services. The wallet services routed user orders to Prime Trust, which had agreed to redeem such orders "instantly." But Prime Trust's system was defective. Prime Trust could not fill the users' orders without itself absorbing substantial losses. Instead of filling the sell orders, Prime Trust disabled its redemption services. No transactions were processed. Users were left to watch helplessly as their savings plummeted.

8.    Over the several days that followed, UST continued to lose value, eventually bottoming out at less than $0.10. Prime Trust refused to fill user sell orders, blaming other unnamed entities for its nonfeasance. Others in the industry squarely place the blame on Prime Trust. As the CEO of one wallet service put it, Prime Trust "violated the law and should be held accountable for this."

## THE PARTIES

9.    Plaintiff Austin Ward is, and at all relevant times was, a resident of the state of California. Plaintiff Ward held UST through a wallet service provider on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime Trust and denied. His redemption order is still pending and has never been filled.

10.    Plaintiff David Krevat is, and at all relevant times was, a resident of the state of Florida. Plaintiff Krevat held UST through a wallet service provider on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime Trust and denied. His redemption order is still pending and has never been filled.

11.    Plaintiff Nabil Mohamad is, and at all relevant times was, a resident of the state of Washington. Plaintiff Mohamad held UST through a wallet service provider on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His order was routed to Prime Trust and denied. His redemption order is still pending and has never been filled.

12.    Defendant Prime Trust is, and at all relevant times was, a for-profit Nevada limited liability company with its principal place of business located at 330 S. Rampart Blvd., Suite 260, Las Vegas, Nevada 89145. It provides business-to-business financial technology infrastructure, such as trust, escrow, and settlement services. According to its official filings with the U.S. Securities and Exchange Commission, it is primarily engaged in banking and financial services.

3

13.    DOES 1 through 10, inclusive, are unknown to Plaintiffs who sue such Defendants by use of such fictitious names. Plaintiffs will amend this complaint to add the true names when they are ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is legally responsible for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by their conduct.

14.    At all relevant times, all Defendants were and are legally responsible for all of the unlawful conduct, policies, practices, acts, and omissions as described herein, unless otherwise indicated.

15.    At all relevant times, the unlawful conduct against Plaintiffs and class members as described herein was actuated, in whole or in part, by a purpose to serve Defendants. At all relevant times, upon information and belief, the unlawful conduct described herein was reasonably foreseeable by Defendants and committed under actual or apparent authority granted by Defendants such that all unlawful conduct is legally attributable to Defendants.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action because Defendant Prime Trust regularly transacts business in Nevada and has purposely availed itself of the privilege of conducting activities in this forum; Defendant Prime Trust has agreed under its policies to submit to the jurisdiction of a court within this jurisdiction; and the matter in controversy exceeds $15,000, exclusive of attorney's fees, interest, and costs. Upon information and belief, when Defendant Prime Trust entered into the relevant agreements and conducted its operations in Nevada, Prime Trust expected to profit by such operations.

17.    Venue is proper because Prime Trust is headquartered and resides within this judicial district.

## FACTUAL ALLEGATIONS

### Cryptocurrency and the "FinTech" that Supports It

18.    For most of the last 75 years, the role of technology in banking and finance was limited to the behind-the-scenes infrastructure that supports money transfers and the stock market. Now, banking and financial services companies use financial technology, or "FinTech," applications for

a wide array of services, including consumer-facing mobile banking, peer-to-peer payment services, and automated trading platforms.

19.     Cryptocurrency is another outgrowth of FinTech. It was originally conceived as a supply of digital money called tokens that buyers and sellers could use to transact goods and services, much like fiat currency. All transactions using cryptocurrency tokens are encrypted and recorded in "blocks" across a network of different computer servers, called a "blockchain." In theory, the blockchain concept allows a marketplace where individual participants can remain anonymous, but all transactions are recorded publicly and visible to all. It also operates independent of banks, which many cryptocurrency enthusiasts see as corrupt.

20.     Many of the most popular cryptocurrencies are highly volatile, fluctuating in value by more than 100 percent in a single year, making them an inefficient means of exchange. They have thrived, however, as investment assets. While they were once considered exotic and novel, investors now treat them as mainstream. In a September 2022 committee hearing, Sen. Dick Durbin described the state of the cryptocurrency market as "an industry where one in five Americans now has invested and had some risk—and we're now getting into retirement accounts and 401(k)s and the like, and the major brokers like Fidelity and others are starting to include this in their plan."

21.     In 2014, several companies began issuing a class of cryptocurrency called "stablecoins." As the name suggests, they are intended to offer investors stability in the otherwise volatile digital asset market. Stablecoins differ from other cryptocurrencies because their value is "pegged" to that of another currency, commodity, or financial instrument. While typical cryptocurrencies are uncollateralized and their value is based on the market for the asset itself, stablecoins are collateralized, or backed by an underlying tangible asset, giving them the same price stability of that asset. For each coin issued, the issuer maintains a pegged value by holding an equal amount of the underlying hard assets in reserve as collateral.

### Prime Trust: A Trust and a Bank for Digital Assets

22.     Prime Trust is a Las Vegas-based limited liability company established in 2016 and chartered in 2017. It evolved from a crowd funding company into what it is today, a designer of

technological infrastructure for digital payments and settlements. It also serves as a trustee of financial assets.

23.    Prime Trust's core product is commonly called an application programming interface, or "API," which is a digital tool that facilitates communication between two or more distinct computer programs. APIs allow banks to connect and share data with other commercial entities so consumers can make transactions, like purchasing goods online, receiving electronically transferred rebates or refunds, or transferring money from one person's account to another's.

24.    In the context of cryptocurrency, Prime Trust's API facilitates all backend aspects of trading. When an investor using a cryptocurrency exchange buys an asset, it is often Prime Trust's API that links the investor's bank account to the market where the asset is sold, moves funds out of the investor's bank account, and moves the asset into the investor's digital wallet where it remains held in custody. Similarly, when a cryptocurrency investor receives investment dividends or sells an asset, Prime Trust's API facilitates the release of the asset from custody, the connection with the investor's bank account, and the deposit of funds into the account.

25.    Prime Trust also serves the role of a bank, publicly describing itself as "a trust company, which is technically a type of bank"[1]. Its services include "custody," "liquidity," and "settlement," whereby Prime Trust acts as custodian, trustee, and exchange desk for both cash and non-cash assets, such as cryptocurrencies. Prime Trust's marketing materials and filings with the U.S. Securities and Exchange Commission acknowledge it is "a 'bank' as defined under SEC Rule 15c2-4 and a 'Qualified Third Party' under Reg CF." It is a member of the American Bankers Association and Nevada Trust Company Association and is overseen by the banking commissioner's office at the Nevada Financial Institutions Division.

26.    Prime Trust is focused on the cryptocurrency market with an emphasis on stablecoins. As of 2021, it served as a trustee for approximately 30 stablecoins. It publicly holds itself out as playing a central role in both backing the stablecoins transacted through its services and ensuring that those stablecoins are adequately collateralized.

---

[1] https://www.youtube.com/watch?v=Ns5bKljImRw (last visited on October 18, 2022).

> You want to make sure that if it's backed one-to-one, that each one of those dollars is somewhere. So that if everybody who owned a stablecoin decided to do a run and liquidate and get their money back, then that should be possible. All of the money should be available. So we do that. We are the third-party, auditable entity that holds those funds. We hold U.S. dollars, we hold other types of assets, we hold gold in bank vaults … we back the stablecoins.
>
> - Kinsey Cronin, former Senior Vice President of Business Development, speaking at the Crypto Invest Summit in Los Angeles, California in 2018[2]

> As a trust, any company that we work with, we ensure that the funds are there that back the coin, so anything that's minted, there's a one-to-one. That's what we do as a trust company, we have to do that.
>
> - Tom Pageler, Prime Trust CEO, responding to questions in a CoinDesk TV Interview, July 2021[3]

27.     Like many other companies in the FinTech field, Prime Trust claimed the ability to use its superior technology to provide services its predecessors could not—to "disrupt" the industry. These included the ability to make transactions instantly and at any time.

> Prime Trust, the crypto custodian and trust company, is redefining traditional and digital financial markets with its financial services platform that now allows clients to instantly transfer any asset between Prime Trust account holders in real-time, 24 hours a day, 7 days a week, 365 days a year.
>
> - Prime Trust press release to Business Wire, July 2019[4]

> Many traditional assets still take a couple of days to settle but modern communications technology means that certain trades, including those executed via blockchain networks, can be completed in or near to real-time.
>
> - Prime Trust Blog Post, March 2022

> Prime Trust's Settlement API allows real-time, 24x7 counterparty settlement of funds and assets within the network. […] We support instant and scheduled settlement of fiat and cryptocurrencies, as well as traditional and digital assets.
>
> - Prime Trust website, primetrust.com, October 2022[5]

---

[2] https://www.youtube.com/watch?v=Ns5bKljImRw (last visited on October 18, 2022).
[3] https://www.youtube.com/watch?v=mW0PXJhKUTk&t=336s (last visited on October 18, 2022).
[4] https://www.businesswire.com/news/home/20190725005200/en/Prime-Trust-Launches-PrimeX™-The-Instant-Counterparty-Settlement-Network (last visited on October 18, 2022).
[5] https://www.primetrust.com/products/liquidity (last visited on October 18, 2022).

### Prime Trust's Wallet Partnerships and the UST Stablecoin

28.     Prime Trust offered its services to a number of different entities in the cryptocurrency industry. One example was Intellabridge, a company that offered its users a service called a Kash wallet. When a Kash user deposited U.S. dollars (or other assets) into their Kash wallet, the dollars could be used in a digital checking account as a means of exchange or deposited into a digital interest-bearing savings account. Other similar services that used Prime Trust for their back-end infrastructure included companies like Alice, Abra, Coinfelx, and Kado.

29.     Prime Trust entered into agreements with several companies that offered digital wallet services whereby Prime Trust agreed to process wallet users' transactions. Based upon information and belief, Prime Trust was responsible under the terms of these agreements to provide services that included, but were not limited to, establishing various types of accounts, escrow services, transaction engines, funds processing, execution of token purchases and sales for users, know your customer ("KYC") services, anti-money laundering ("AML") compliance services, and "Bad Actor" checks. It also included a clause in its contracts whereby Prime Trust was required to process any purchase, sale, exchange, investment, disbursement or reinvestment made by wallet users "at any time" they directed Prime Trust to do so.

30.     When a wallet user wished to deposit funds into their wallet, it was Prime Trust that linked to the user's bank account, withdrew the funds, made the dollars-to-digital asset transaction, and held the funds in trust. When a wallet user wished to withdraw funds from their wallet, it was again Prime Trust that processed the request, converted the digital asset back to dollars, and deposited the funds in the user's bank account.

31.     Wallet users, including Plaintiffs, had no privity of contract with Prime Trust. Despite the lack of privity, Prime Trust held a special relationship with wallet users. It entered an agreement to serve as custodian of their funds, accepted their deposits, and held itself out as a "trust," responsible for keeping those deposits secure. It directly accessed wallet users' private bank accounts to withdraw and deposit funds and gathered and shared information collected from and about wallet users to perform KYC, AML, and Bad Actor compliance checks. It also publicly stated it "backed" stablecoins transacted through its services and "ensured" that digital assets were

maintained sufficient collateral to hold their pegged, one-to-one value because, "that's what we do as a trust company."

32.    Among the services Prime Trust offered for its wallet partners was "instant" settlement of transactions when wallet users sold cryptocurrencies.

> Integration with Prime Trust means you can focus on delivering the best user experience possible, while we focus on the flow of funds.
>
> Your Focus ... User Sells Crypto
>
> Our Focus ... Instant or Delayed Settlement



-    Prime Trust website, primetrust.com, October 2022[6]

33.    As of May 2022, several thousand wallet users' digital asset holdings were invested in a stablecoin known as TerraUSD, or UST. UST was a digital token issued by South Korea-based Terraform Labs.

34.    UST was designed and marketed as being pegged in value to the U.S. dollar. Unlike other stablecoins, UST was not backed by any hard asset held in reserve. Instead, it used an algorithm and a system of supply controls and swaps to maintain its $1 value. If demand for UST rose,

---

[6] https://www.primetrust.com/use-cases/crypto-on-off-ramp (last visited on October 18, 2022).

applying pressure on its price to rise above $1, holders of another Terraform Labs token called the Luna could create, or "mint," additional UST, thereby increasing the total supply of UST and pushing its value back down to $1. Conversely, if demand for UST fell and applied pressure on its value to fall below $1, UST holders could swap one UST token for $1 worth of Luna, "burning" the UST and again pushing the price back to $1 by reducing its supply.

35.    As a so-called stablecoin, UST was held out as being designed to hold a constant value. Yet those who held UST ("depositors") stood to make astronomical gains by the annual percental yield (APY) it generated. UST was a part of a lending program, also controlled by Terraform Labs, referred to as the "Anchor" protocol. If a depositor purchased UST and deposited it into Anchor, Anchor would then lend the deposit to a borrower. The borrower's collateral was returned to the original depositor (or across multiple depositors) in the form of interest payments—similar to the way traditional retail banks provide interest on savings accounts. The APY on UST deposits, however, was unlike that offered by retail banks in that it was typically around 20 percent, over 100 times higher than the APY offered by the average American savings account.

36.    The Anchor protocol system depended on an inflow of UST depositors and funds. The more money that was deposited into the system, the more it could lend to its borrowers, and the longer it continued to offer UST depositors such exceptional APY. The financial success of UST depositors was dependent on the abilities of Anchor's designers to successfully implement the protocol and on the abilities of those promoting and selling UST, such as Prime Trust's wallet partners, to continue to increase the inflow of investment to the protocol.

37.    Wallet services generated revenue from the issuance of UST by charging fees for their exchange and account services. They shared a portion of those revenues with Prime Trust, which facilitated all wallet users' transactions. In this way, both the wallet services and Prime Trust stood to benefit from increased sale of and investment in UST.

38.    As of May 2022, Prime Trust was the custodian of several million dollars of savings held in UST and diverted to it by way of their various wallet partners.

**The May 2022 Run on the UST Stablecoin**

39.     Contrary to its claims about its role as a trust company, Prime Trust failed to ensure UST was collateralized one-to-one with the U.S. dollar or take any other steps to confirm that "the funds are there that back the coin."

40.     Neither Prime Trust nor any other entity ever took steps to register UST with the U.S. Securities and Exchange Commission, Commodity Futures Trading Commission, or any other federal regulator or enforcement agency. Nor did any entity take steps to register, qualify, or permit UST as a security with any state regulatory agency, such as the California Financial Protection and Innovation Commissioner or New York Department of Financial Services.

41.     Because UST was uncollateralized, which was not commonly known, it was always susceptible to the high risk of price volatility associated with other cryptocurrencies (and, arguably, not actually a stablecoin). That risk materialized in early May of 2022. On May 7, 2022, the Luna price fell dramatically. The following day, UST started losing value, falling from its $1 target price. A collateralized stablecoin would have maintained its peg because it could always, in theory, be exchanged one-to-one with the currency in which it was denominated. But with no collateral backing its price peg, UST had nothing to prop it up. Soon, mass quantities of UST were being sold off and, as UST started losing its value, depositors rushed to sell their UST to preserve what remained of their savings.

42.     By May 9, 2022, UST was unpegged from the U.S. dollar. Its value was fluctuating around $0.90. Thousands of depositors who owned UST through wallets placed orders to sell off UST before the price fell further. The wallet systems, for their part, processed the orders, which were then submitted to Prime Trust. Prime Trust did not complete the transactions upon the depositors' instruction as it stated it could and would do. In fact, Prime Trust refused to complete the transactions at all.

43.     Based upon information and belief, the manner in which Prime Trust had written its coding required a one UST-for-one U.S. dollar redemption value when filling UST sale orders. Thus, in order to complete the transactions, Prime Trust would have to give wallet users $1.00 for

something that was worth only approximately $0.90. Instead of taking the loss, Prime Trust simply disabled its transaction function.

44.     Within a week, the value of UST had dropped to $0.09—a fall of over 90 percent. Wallet users who had attempted to withdraw their funds when UST was at $0.90 or more were still told their orders were "pending." The downturn wiped out billions of dollars of market capital in a matter of days. U.S. Treasury Secretary Janet Yellen cited the collapse in testimony to Congress when calling for a stronger framework to regulate stablecoins and noted, "they present the same kind of risks that we have known for centuries in connection with bank runs."

45.     Users inundated Prime Trust's wallet partners with demands for information. Eventually, some services like Kash and Alice blocked further orders from routing to Prime Trust. Intellabridge's CEO, John Eagleton, issued a statement to users on May 15, 2022.

> [O]ur infrastructure provider Prime Trust and their exchange partner have been unable to provide their customers with UST to USD exchange due to the market conditions. Exchanges of UST to USD in the first 24-48 hours of the crisis, resulted in pending transactions which are still pending. To protect customers from erroneously getting their UST stuck in a pending state, Kash disabled future UST to USD exchanges and Terra UST deposits. For those customers with pending UST to USD transactions, please contact Prime Trust customer support at customersupport@primetrust.com.

46.     Panicked users sought information from Prime Trust, but were stonewalled, often waiting five or more days before they received a response. If or when Prime Trust did respond, its customer service representatives instructed the users they would have to seek resolution from others. The frustration users faced here only compounded the distress they felt after having to idly watch their savings vanish.

47.     Eventually, Prime Trust posted a statement to its customer service site formatted as questions and answers pointing the blame at an unidentified "UST liquidity provider" for its refusal to process transaction orders.

**What was Prime Trust's role in the UST collapse?**

Prime Trust had no role in the UST collapse. UST's stability was compromised as a result of large sell volumes and a loss of confidence in the Terra Luna ecosystem. This, in turn, led to the unrecoverable depegging of UST, negatively impacting the entire cryptocurrency ecosystem. As a result, Prime Trust's UST liquidity provider stopped servicing Prime Trust, which terminated our ability to service UST trade requests.

48.    UST has been essentially abandoned and now trades under the name "TerraClassicUSD" (USTC) for approximately $0.03 on mostly non-U.S. exchanges.

49.    While Prime Trust claimed it was powerless to fill wallet users' orders, others in the industry characterized Prime Trust's conduct differently. John Eagleton described it this way:

> We are convinced that Prime Trust, by freezing crypto asset exchange transactions, violated the law and should be held accountable for this, first of all, to compensate users for losses.

50.    Based upon information and belief, Prime Trust's role in withholding wallet users' funds is currently under investigation by the Nevada Bureau of Consumer Protection and the Financial Institutions Division of the Department of Business & Industry Financial Institutions. The California Department of Financial Protection & Innovation, Pennsylvania Department of Banking & Securities, and the Federal Trade Commission also have open investigations.

## CLASS ALLEGATIONS

51.    Plaintiffs bring this action to seek relief as a class action, on behalf of themselves and the following Class ("the Class"):

> All persons who placed orders to sell TerraUSD (UST) on or after May 9, 2022, that were routed to Prime Trust, but that were not processed or settled by Prime Trust at UST's market value at the time they were placed.

52.    Plaintiffs reserve the right to amend the Class definition if discovery or further investigation demonstrate that it should be expanded or otherwise modified.

53.    The members of the Class are so numerous, counting no less than 50 persons, that joinder of all members would be impracticable.

54.    There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

a.  Whether Defendants owed the Class a fiduciary duty;

b.  Whether Defendants held a role of trustee with respect to the Class;

c.  Whether Defendants held a role of escrow agent with respect to the Class;

d.  Whether Defendants' conduct breached the fiduciary duty they owed to the Class;

e.  Whether Defendants' statements and representations were false and misleading;

f.  Whether Defendants concealed material information;

g.  Whether Defendants' conduct constituted deceptive trade practices;

h.  Whether Defendants stole, took away, converted, or appropriated the Class's property;

i.  Whether Defendants owed members of the Class a standard duty of care;

j.  Whether Defendants breached the standard duty of care they owed the Class;

k.  Whether Defendants' conduct violated Nevada state trust laws, including NRS 164.715 and 164.740;

l.  Whether Defendants' conduct caused the Class losses and harm; and

m. The nature and quantity of damages suffered by members of the Class.

55.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests antagonistic to those of the Class and are not subject to any unique defenses.

56.    Plaintiffs will fairly and adequately protect the interests of the Class and have retained attorneys experienced in class action and complex litigation.

57.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

a.  It is economically impractical for members of the Class to prosecute individual actions;

b.  The Class is readily ascertainable and definable;

c.  Prosecution as a class action will eliminate the possibility of repetitious litigation; and

d.  A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

58.    Plaintiffs do not anticipate any difficulty in the management of this litigation.

14

## CAUSES OF ACTION

### First Cause of Action

### Breach of Fiduciary Duty

59.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

60.    Defendants owed Plaintiffs and members of the Class a fiduciary duty by virtue of the confidence reposed in the integrity of Defendants by Plaintiffs and members of the Class. Defendants, who voluntarily accepted or assumed to accept this confidence, could take no advantage from their acts relating to the interest of Plaintiffs and members of the Class without the knowledge or consent of Plaintiffs and members of the Class.

61.    In addition to the general role of a fiduciary, Defendants served the role of trustee in a trust for which Plaintiffs and members of the Class were beneficiaries. Defendants were bound by the fiduciary duty attendant to this role to act with the utmost good faith for the benefit of Plaintiffs and members of the Class. Under NRS 164.715, Defendants' duty in the role of trustee included a duty to manage the trust "solely in the interest of the beneficiaries."

62.    In addition to the general role of a fiduciary, Defendants served the role of escrow agents in transactions where Plaintiffs and members of the Class were parties. Defendants were bound by the fiduciary duty attendant to this role to act with the utmost good faith for the benefit of Plaintiffs and members of the Class and to pay funds it held in escrow as instructed to Plaintiffs and members of the Class at the time and in the amount that Plaintiffs and members of the Class were entitled to receive it.

63.    As fiduciaries, Defendants owed Plaintiffs and members of the Class a duty of loyalty. This role also placed a duty on Defendants to avoid any self-dealing that would place their interests in conflict with their obligations to Plaintiffs and members of the Class.

64.    As fiduciaries, Defendants owed Plaintiffs and members of the Class a duty to exercise a reasonable degree of skill and care when managing the role entrusted to them by Plaintiffs and members of the Class. This included a duty to take steps to ensure the assets held by Plaintiffs and members of the Class were collateralized one-to-one with the U.S. dollar, to design and implement

systems and policies that would achieve the objectives of the trust, and to execute transactions ordered by Plaintiffs and members of the Class at the time and in the manner that would least harm Plaintiffs and members of the Class.

65.     As fiduciaries, Defendants owed Plaintiffs and members of the Class a duty to carry out the trust in in accordance with its terms. This duty included executing the transactions ordered by Plaintiffs and members of the Class at the time they were ordered and in the manner in which Plaintiffs and members of the Class would be least harmed.

66.     As fiduciaries, Defendants owed Plaintiffs and members of the Class a duty to make full disclosure. This duty included a duty to fully disclose to Plaintiffs and members of the Class all known material facts that might affect the rights and objectives of Plaintiffs and members of the Class, such as the absence of hard collateral to back the assets Plaintiffs and members of the Class transacted, Defendants' own failure to ensure the assets held by Plaintiffs and members of the Class were collateralized one-to-one with the U.S. dollar, the deficiencies in Defendants' systems and policies that resulted in Defendants' refusal to execute transaction orders made by Plaintiffs and members of the Class, and Defendants' delegation to third parties of responsibilities that resulted in transaction orders made by Plaintiffs and members of the Class remaining unexecuted.

67.     As fiduciaries, Defendants owed Plaintiffs and members of the Class a duty not to delegate their responsibilities under the trust to another if doing so would unnecessarily expose the interests of Plaintiffs and members of the Class to risk of harm. This included a duty not to place in the hands of others the power to frustrate the purpose of the trust or to deny Plaintiffs and members of the Class from achieving the purpose of the trust.

68.     Plaintiffs and members of the Class were harmed to a degree that was unnecessary and unreasonable by Defendants' breach of their duties when Defendants failed to act as a reasonably careful fiduciary would have acted under the same or similar circumstances. Defendants failed to ensure the assets held by Plaintiffs and members of the Class were collateralized one-to-one with the U.S. dollar, failed to design and implemented systems and policies that unnecessarily exposed Plaintiffs and members of the Class to harm, and that resulted in Defendants knowingly and

16

1  intentionally failing to execute transactions ordered by Plaintiffs and members of the Class when
2  they were so ordered.

3  69.    Plaintiffs and members of the Class were harmed to a degree that was unnecessary and
4  unreasonable by Defendants' breach of their duties when Defendants delegated the critical
5  functions of the trust to others, without disclosure to or consent of Plaintiffs and members of the
6  Class, thereby needlessly exposing Plaintiffs and members of the Class to harm.

7  70.    Plaintiffs and members of the Class were harmed to a degree that was unnecessary and
8  unreasonable by Defendants' breach of their duties when Defendants failed to fully and fairly
9  disclose to Plaintiffs and the Class all material facts known to them affecting Plaintiffs' and the
10  Class's interests, including failing to provide clear and accurate accounts of the administration of
11  the transactions made by of Plaintiffs and members of the Class, withholding the fact that the assets
12  transacted by Plaintiffs and members of the Class hard no collateral to back the assets, withholding
13  the fact that Defendants' failed to ensure the assets held by Plaintiffs and members of the Class
14  were collateralized one-to-one with the U.S. dollar, withholding the deficiencies in Defendants'
15  systems that would prevent them from executing transactions ordered by Plaintiffs or members of
16  the Class, and withholding the delegation to third parties of responsibilities that were critical to the
17  objectives of Plaintiffs and members of the Class.

18  71.    Defendants put their own interests above those of Plaintiffs and members of the Class by
19  knowingly and intentionally refusing to execute transactions ordered by Plaintiffs and the Class
20  that would have been to the detriment and at the cost of Defendants. Defendants' refusal to execute
21  the transactions was instead detrimental and costly to Plaintiffs and members of the Class, and in
22  amounts that far outweighed the detriment and cost avoided by Defendants by refusing to execute
23  the transactions.

24  72.    Defendants' conduct was a cause and a substantial factor in bringing about Plaintiffs' and
25  the Class's harm and Plaintiffs seek damages in law for the harm caused, which exceed $15,000.

26
27
28

## Second Cause of Action

### Deceptive Trade Practices

### NRS 41.600 & NRS Chapter 598

73.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

74.    NRS 41.600 authorizes a civil action for any person who is a victim of consumer fraud. NRS 41.600(2) defines "consumer fraud" to include "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."

75.    NRS 598.0915 includes the following conduct as "deceptive trade practices":

    a.    Knowingly making a false representation as to the characteristics of goods or services for sale. NRS 598.0915(5).

    b.    Advertising goods or services with intent not to sell or lease them as advertised. NRS 598.0915(9).

    c.    Knowingly making any other false representation in a transaction. NRS 598.0915(15).

76.    NRS 598.092 includes the following conduct as "deceptive trade practices": knowingly misrepresenting the legal rights, obligations or remedies of a party to a transaction. NRS 589.092(8).

77.    NRS 598.0923 includes the following conduct as "deceptive trade practices":

    a.    Knowingly failing to disclose a material fact in connection with the sale or lease of goods or services. NRS 598.0923(1)(b).

    b.    Knowingly violating a state or federal statute or regulation relating to the sale or lease of goods or services. NRS 598.0923(1)(c).

    c.    Using an unconscionable practice in a transaction. NRS 598.0923(1)(e).

78.    NRS 598.0925 includes the following conduct as "deceptive trade practices": making an assertion of quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true. NRS 598.0925(1)(a).

79.    Defendants engaged in deceptive trade practices when they made statements and representations indicating they "back" stablecoins. These statements and representations included

claims Defendants would and did ensure the assets held by Plaintiffs and members of the Class were collateralized or backed one-to-one with U.S. dollars and that if those who held such assets sought to liquidate their holdings, that their money would be available to them from Defendants; and claims that Defendants, as trust companies, were obligated to and did ensure that funds back the assets held by Plaintiffs and members of the Class.

80.     Defendants engaged in deceptive trade practices when they made statements and representations indicating they allowed Plaintiffs and members of the Class to make transactions "instantly." These statements and representations included claims that Defendants allowed users to instantly transfer assets in real-time, 24 hours a day, 7 days a week, 365 days a year; claims that the trades they executed were completed in or near to real-time; and claims that they facilitated instant settlement of fiat and cryptocurrencies, as well as traditional and digital assets.

81.     Defendants engaged in deceptive trade practices when they made statements and representations that misleadingly withheld, omitted, and concealed material facts that affected the rights and interests of Plaintiffs and members of the Class. These statements and representations included claims where Defendants withheld the fact that the assets transacted by Plaintiffs and members of the Class had no collateral to back them, withheld the fact that Defendants' failed to ensure the assets held by Plaintiffs and members of the Class were collateralized one-to-one with the U.S. dollar, withheld the deficiencies in Defendants' systems that would prevent them from executing transactions ordered by Plaintiffs or members of the Class, and withheld the delegation to third parties of responsibilities that were critical to the objectives of Plaintiffs and members of the Class.

82.     The statements and representations made by Defendants were made for the benefit of the reputation and revenue of Defendants and to induce, directly or indirectly, others to purchase the services of and enter into a business relationship with Defendants.

83.     Defendants' conduct was a cause and a substantial factor in bringing about Plaintiffs' harm and Plaintiffs seeks damages in law for the harm caused, including Plaintiffs' litigation costs and reasonable attorneys' fees as allowed under NRS 41.600(3), which exceed $15,000.

**Third Cause of Action**

**Conversion**

84.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

85.    Plaintiffs and members of the Class allowed Defendants to withdraw funds from their wallet accounts to effectuate the purchase of digital assets on their behalf. Plaintiffs and members of the Class were the rightful owners of the digital assets that were purchased.

86.    As alleged above, Defendants restricted transactions involving UST in a manner that prevented Plaintiffs and members of the Class from accessing and selling their UST. Plaintiffs and members of the class placed sell orders for UST that were routed to Defendants and were within Defendants' power and authority to execute, but Defendants refused to execute the orders. In so doing, Defendants effectively took possession and control of the assets that rightfully belonged to Plaintiffs and members of the Class.

87.    Plaintiffs and members of the Class did not consent to or authorize Defendants' restrictions.

88.    The value of the UST owned by Plaintiffs and members of the Class has fallen since the time the placed orders to sell from nearly $1.00 per token to nearly $0.00 per token, resulting in significant economic losses.

89.    By taking possession of the assets of Plaintiffs and members of the Class and then preventing them from transacting those assets, Defendants substantially interfered with their property rights to those assets.

90.    As a direct and proximate cause of Defendants' unauthorized interference, Plaintiffs and members of the Class were damaged in an amount to be proven at trial, which exceed $15,000.

**Fourth Cause of Action**

**Unjust Enrichment**

91.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

92.    Plaintiffs and members of the Class conferred a monetary benefit on Defendants by granting Defendants access to withdraw funds from their accounts and allowing Defendants the power to execute transactions on their behalf.

93.    Defendants enriched themselves by refusing to execute the transactions ordered by Plaintiffs and members of the Class, which would have exposed Defendants to financial losses, and instead forced those losses onto Plaintiffs and members of the Class.

94.    Rather than executing the transactions ordered by Plaintiffs and members of the Class at a reasonable time and suffering any losses associated with their inability to fill sell orders at any price below $1.00 per token, Defendants instead calculated to avoid suffering losses at the expense of Plaintiffs and members of the Class by refusing to execute any transactions in UST whatsoever. Plaintiffs and members of the Class, on the other hand, suffered significant losses as a direct and proximate result of Defendants' failure to execute the sell orders when instructed.

95.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and members of the Class, because Defendants failed to design, implement, and administer policies and systems to execute the transactions ordered by Plaintiffs and members of the Class in a timely and effective manner.

96.    Defendants acquired the monetary benefit through inequitable means in that they failed to disclose the failures in the design, implementation, and administration for their policies and systems previously alleged.

97.    If Plaintiffs and members of the Class knew that Defendants had not designed, implemented, and administered their policies and systems to execute the transactions ordered by Plaintiffs and members of the Class in a timely and effective manner, they would not have agreed to give control of their funds to Defendants.

98.    Defendants accepted and retained the monetary benefits conferred upon them by Plaintiffs and members of the Class under circumstances indicating Defendants would act as trustee and escrow agent, and would execute transactions ordered by Plaintiffs and members of the Class in a timely and effective manner, and it would, therefore, be inequitable for them to retain such benefit without repayment of the value thereof.

21

99.    As a direct and proximate result of Defendants conduct, Plaintiffs and members of the Class have suffered and will suffer injury, including but not limited to the loss of their investments, which exceed $15,000.

100.    Defendants should be compelled to disgorge any and all proceeds that they unjustly received from Plaintiffs and members of the Class.

### Fifth Cause of Action

### Negligence

101.    Plaintiffs reallege and incorporate the above allegations by reference as if set forth fully herein.

102.    Defendants owed Plaintiffs and members of the Class a duty based on:

a.    Affirmative conduct and representations. Defendants undertook to perform tasks for an on behalf of Plaintiffs and members of the Class, including establishing links to their financial accounts, accepting and receiving their funds, conducting transactions upon their request, conducting settlement services upon their request, and depositing funds into their financial accounts. Defendants represented they would take specific actions for the direct benefit of Plaintiffs and members of the Class, including conducting due diligence into the digital assets they transacted and facilitating transactions instantly at any time.

b.    Their special relationship. Defendants established a special relationship with Plaintiffs and members of the Class by executing transactions intended benefit them through savings profits. It was highly foreseeable that Plaintiffs and members of the Class would be harmed if these transactions were mishandled as they would cause them savings losses. As the entity controlling the means and manner of the transactions ordered by Plaintiffs and the Class, Defendants' execution of these transactions was closely connected with the savings losses Plaintiffs and the members of the Class were foreseeably likely to suffer. Public policy supports a finding of duty through a special relationship in such circumstances to prevent future harm of a similar nature and

because Defendants were morally to blame for the losses of Plaintiffs and members of the Class.

c. Bailment. Plaintiffs' and the Class's funds were delivered to Defendants and Defendants were entrusted with the care and custody thereof. Defendants were obligated by affirmative representations and agreements, affirmative conduct, custom and practice, and the circumstances surrounding Defendants' possession of Plaintiffs' and the Class's funds to hold the funds delivered to them for a certain purpose, giving rise to a duty to use care in handling the funds and to return the funds as ordered.

103.    Defendants breached their duty to Plaintiffs and members of Class by failing to design, implement, and administer policies and systems to execute the transactions ordered by Plaintiffs and members of the Class in a timely and effective manner; by knowingly and intentionally refusing to execute transactions ordered by Plaintiffs and members of the Class; and by generally failing to exercise that degree of care that an ordinarily careful and prudent person would exercise under the same or similar circumstances.

104.    Defendants' conduct was the proximate and legal cause of Plaintiffs' and members of the Class's injuries, damages, losses, or harms, which were themselves likely to occur in the natural and continuous sequence of events produced by Defendants' conduct and would not have occurred but for that conduct. Defendants' conduct was a substantial factor in bringing about the injury, damage, loss, or harm suffered by Plaintiffs and members of the Class.

105.    Defendants' conduct also violated various laws that were applicable to it at the time of the subject incident; that were designed to prevent injury, damage, loss, or harm of the type Plaintiffs and members of the Class suffered; and that were designed to protect consumers, investors, and others who were of the same class of persons as Plaintiffs and the Class. These laws included:

a. NRS 41.600 & NRS Chapter 598, which were violated when Defendants engaged in deceptive trade practices by making false and misleading statements and representations and withholding, omitting, or concealing material facts affecting the rights and interests of Plaintiffs and members of the Class.

b. NRS 164.715, which was violated when Defendants, as trustees, failed to manage the savings of Plaintiffs and members of the Class solely in the interest of Plaintiffs and members of the Class.

c. NRS 164.740, which was violated when Defendants, as trustees entrusted with managing the savings of Plaintiffs and members of the Class, breached their duty to comply with the prudent investor rule, which required Defendants to manage said savings as a prudent investor would, considering the terms, purposes, requirements for distribution, and other circumstances of the trust; to exercise reasonable care, skill and caution; to evaluate said savings in the context of the trust portfolio as a whole and as part of an overall strategy of savings having objectives for risk and return reasonably suited to the trust; to consider general economic conditions, the needs for liquidity; to make a reasonable effort to verify facts relevant to the management of the savings; and apply their special skills or expertise in the digital asset investment industry.

106. By violating these laws, Defendants were negligent *per se*.

107. Defendants' breach of duty and violations of law caused Plaintiffs and members of the Class to suffer injuries, damages, losses, or harms, including the loss of their funds, the stress and anxiety of helplessly watching their savings dwindle, and the loss of time associated with fruitlessly trying to recover their funds from Defendants, which exceed $15,000.

///

///

///

24

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment against Defendants as follows:

    A.  For an order certifying the proposed Class;

    B.  For an order appointing Plaintiffs and their counsel to represent the Class;

    C.  For actual and compensatory damages according to proof pursuant to statute and all other applicable laws and regulations, which exceed $15,000;

    D.  For restitution to the extent permitted by applicable law;

    E.  For punitive damages to the extent permitted by applicable law;

    F.  For pre-judgment and post-judgment interest;

    G.  For an award of attorneys' fees, costs, and expenses as authorized by applicable law; and

    H.  For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable pursuant to NRCP 38(b).

Dated this 2nd day of November, 2022.


*/s/ Mona Kaveh*
Michael Gayan, Esq. (#11135)
Mona Kaveh, Esq. (#11825)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Julie Erickson, Esq. (*pro hac vice pending*)
Elizabeth Kramer, Esq. (*pro hac vice pending*)
Kevin Osborne, Esq. (*pro hac vice pending*)
ERICKSON KRAMER OSBORNE LLP
44 Tehama Street
San Francisco, CA 94105

*Attorneys for Plaintiffs*