1  Michael Gayan, Esq. (#11135)
   m.gayan@kempjones.com
2  Mona Kaveh, Esq. (#11825)
   m.kaveh@kempjones.com
3  KEMP JONES, LLP
   3800 Howard Hughes Parkway, 17th Floor
4  Las Vegas, NV 89169
   Telephone: (702) 385-6000
5  Facsimile: (702) 385-6001

6  Julie Erickson (*pro hac vice pending*)
   julie@eko.law
7  Elizabeth Kramer (*pro hac vice pending*)
   elizabeth@eko.law
8  Kevin Osborne (*pro hac vice pending*)
   kevin@eko.law
9  ERICKSON KRAMER OSBORNE LLP
   44 Tehama Street
10 San Francisco, CA 94105
   Telephone: 415-635-0631
11 Facsimile: 415-599-8088

12 *Attorneys for Plaintiffs and the putative class*

13               **UNITED STATES DISTRICT COURT**

14                    **DISTRICT OF NEVADA**

15 AUSTIN WARD, DAVID KREVAT, and        Case No.:  2:22-cv-02034-APG-EJY
16 NABIL MOHAMAD, individually and on
   behalf of others similarly situated,    **PLAINTIFFS' OPPOSITION TO**
17 VS.                                      **DEFENDANT'S MOTION TO DISMISS**
                                            **COMPLAINT [ECF NO. 30]**
18 PRIME TRUST, LLC; and DOES 1-10,
19                                          **[ORAL ARGUMENT REQUESTED]**
        Defendants.
20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Plaintiffs are investors who bought a digital asset that was, in theory, pegged in value to the U.S. dollar. Defendant Prime Trust, LLC was the custodian of Plaintiffs' funds and created trust accounts where it held the asset on their behalf. In early May 2022, the asset lost its peg to the dollar and fell to a value around $0.90. Plaintiffs placed sell orders, seeking to liquidate their holdings and cut their losses. As a trustee and fiduciary, Prime Trust was obligated to follow Plaintiffs' directives and redeem their funds. But because of a feature of Prime Trust's coding and complications with its "liquidity partner," it was unable to fill Plaintiffs' orders without incurring losses itself. Neither the coding feature nor the dependence on a liquidity partner were ever disclosed to Plaintiffs. Despite Plaintiffs' directives, Prime Trust put its own interest first and simply refused to redeem the funds. Within days, the asset collapsed, falling in value to less than $0.10. Plaintiffs' investments were decimated.

Prime Trust moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6) arguing that it had no obligations as a fiduciary, was not bound by any duty to Plaintiffs, and should not bear any responsibility for Plaintiffs' losses. But its Motion wildly mischaracterizes the allegations of Plaintiffs' Complaint and fails to make the showing required under Rule 12(b)(6). It also bases much of its argument on inadmissible extraneous documents that are not referenced anywhere in the Complaint, rendering the Motion either factually hollow or procedurally defective. Plaintiffs' claims, meanwhile, are all plausibly alleged and withstand scrutiny, even though they are based on novel applications of law. Accordingly, Prime Trust's Motion should be denied in its entirety and the matter should be allowed to proceed.

## II.

## FACTUAL BACKGROUND

While the asset and transactions involved in this case are complex, the basis for liability is simple. Prime Trust held a financial asset in trust accounts as a custodian for Plaintiffs. When the asset began to lose value and Plaintiffs placed orders requiring Prime Trust to redeem it for U.S. dollars,

Prime Trust simply refused to do so. While Prime Trust delayed, the asset lost nearly all its value. This short summary encapsulates the facts laid out in more depth in the Plaintiffs' Complaint, which establishes Plaintiffs' theories of liability and are detailed further here.

**A.      The Business of Prime Trust.**

Prime Trust provides services to companies and investors in the digital finance space. ECF No. 1-2 (Plaintiffs' Complaint, or "Compl.") at ¶¶ 22-24. It claims it is a "trust company, which is technically a type of bank." *Id*. at ¶ 25. Prime Trust claims to perform multiple functions in its role as a bank. First, it claims to ensure that the assets transacted through its services are "backed," or that there are real funds held in reserve to pay out investors in the event there is a run on the assets. *Id*. at ¶ 26. This applies particularly to a class of cryptocurrencies called stablecoins, which are theoretically pegged in value to some underlying hard asset like the U.S. dollar. *Id*. at ¶¶ 21, 26. Second, it claims to offer "real time" settlements for digital asset transactions, allowing investors who place orders to redeem an asset for fiat currency the ability to settle the transaction and collect instantaneously. *Id*. at ¶¶ 27, 32.

**B.      Prime Trust's Relationship to Plaintiffs.**

Based on the facts known to Plaintiffs, there were two degrees of separation between them and Prime Trust. Compl. at ¶ 31. Plaintiffs had a direct relationship with companies referred to as "wallets," which offered retail investors like Plaintiffs a means to convert dollars into digital assets. *Id*. at ¶ 28. The wallet companies had a direct relationship with Prime Trust, which performed functions generally invisible to Plaintiffs, such as establishing accounts where wallets could deposit Plaintiffs' investment funds, interfacing with Plaintiffs' banks to facilitate money transfers, and processing transaction orders Plaintiffs made. *Id*. at ¶¶ 29-30. Plaintiffs had no contractual relationships with Prime Trust.[1] *Id*. at ¶¶ 31.

**C.      Prime Trust's Failures When the UST Stablecoin Collapsed.**

The TerraUSD stablecoin, or "UST," was a digital asset that used an algorithm and supply controls to keep a one-to-one peg in value to the U.S. dollar. Compl. at ¶¶ 34-35. It provided its

---

[1] Prime Trust files with its motion to strike three documents it claims are contracts between Plaintiffs and Prime Trust. ECF Nos. 29-2, 29-3, & 29-4. As explained below, these documents are either inadmissible or convert this to a deficient motion for summary judgment.

investors with annual percentage yields as would money held in a traditional savings account, although its yield rates were much higher than those typically offered by banks. *Id*. Plaintiffs and the members of the Class invested in UST through wallet services, with which they had direct relationships. *Id*. at ¶ 28. The wallet services, in turn, used Prime Trust's services to hold the investors' assets in custodial trust accounts. *Id*. at ¶¶ 29-30. When investors instructed their wallet services that they wished to withdraw funds from their accounts or redeem holdings in UST for U.S. dollars, the wallet services routed those orders to the custodian, Prime Trust, to perform. *Id*. at ¶ 30.

In early May 2022, UST began to lose value. Compl. at ¶¶ 41. Initially, it fell to $0.90, at which point many investors sought to redeem their UST for U.S. dollars, liquidating their holdings by placing sell orders with their wallet services. *Id*. at p 42. The wallet services routed their customers' orders to Prime Trust, but Prime Trust refused to fill the orders. *Id*. Investors who had placed orders when UST was valued at $0.90 watched helplessly as their investments continued to fall the course of the following days. *Id.* at ¶ 44. Within a week, the value of UST fell to $0.09 and Prime Trust had still not redeemed their orders. *Id.* Ultimately, the UST fell to $0.03. *Id.* at ¶ 48. Had Prime Trust filled the investors' orders when the UST's value was still relatively high, the investors would still have taken losses. But those losses would have been minimal compared to what they lost as the result of Prime Trust's complete refusal to fill the orders while the UST continued to fall.

Prime Trust claimed the reason it refused to fill the orders was a complication with an undisclosed "liquidity provider," upon which Prime Trust depended to fill orders. Compl. at ¶ 47. Prime Trust's real motive for refusing the investors' requests was its own profits. Compl. at ¶ 43. Because of an oversight in its coding, Prime Trust would have suffered its own losses if it had completed the orders the investors places. *Id*. Instead of absorbing these losses, Prime Trust refused to fill the orders and left the burden of the losses on the investors alone.

### D.   Prime Trust's Conduct Violated Nevada Law and Plaintiffs' Rights.

As a trustee and fiduciary, Prime Trust owed Plaintiffs a multitude of obligations. Most obviously, it owed them a duty to fill their orders when they were placed. Moreover, it owed them a duty to disclose the material facts that its system was designed so that it could refuse to execute transactions and its ability to fill orders depended on some anonymous third party. Prime Trust breached

these duties in violation of Nevada law, a sentiment echoed in public comments by one wallet service's CEO, who claimed freezing investor transactions "violated the law." *Id*. at ¶ 49.

Based on these facts, Plaintiffs filed a complaint alleging Prime Trust's misconduct (1) breached various fiduciary duties owed to Plaintiffs and the Class (Compl. at ¶¶ 59-72), (2) violated the Nevada Deceptive Trade Practices Act (NRS 41.600 & NRS Chapter 598) (the "NDTPA") (*Id*. at ¶¶ 73-83); (3) illegally converted Plaintiffs' funds (*Id*. at ¶¶ 84-90); (4) unjustly enriched Prime Trust (*Id*. at ¶¶ 91-100); and (5) constituted negligence and negligence *per se* under Nevada law (*Id*. at ¶¶ 101-107).

**E.    Prime Trust's Motion Wildly Mischaracterizes Plaintiffs' Complaint.**

> *1)  The Motion's Mischaracterizations of the Complaint's Factual Allegations.*

Prime Trust's Motion so mischaracterizes the facts alleged in Plaintiffs' Complaint that one would think the Motion is describing a totally different document. To start with, Prime Trust falsely claims the Complaint references the documents it calls "User Agreements" that were filed with its Motion. ECF No. 30 (Prime Trust's Motion to Dismiss, or "Mot.") at p. 2, fn. 2. If this were true, the agreement would be admissible and considered as a part of the Complaint itself. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014). But Plaintiffs had no knowledge these documents existed and explicitly state in the Complaint they "had no privity of contract with Prime Trust." *Id*. at ¶ 31. The only agreements referenced in the Complaint are the agreements Prime Trust entered into with the wallet services used by Plaintiffs and the Class. Compl. at ¶ 29.

The Motion also repeatedly mischaracterizes the Complaint as failing to plead certain facts that it does, in fact, plead. For example, the Motion claims the Complaint fails to plead that Prime Trust was obligated to complete Plaintiffs' orders at the time the orders were made. *See, e.g.*, Mot. at p. 2:17-19; 5:21-22. This is incorrect. The Complaint plainly states that "Prime Trust was required to process any purchase, sale, exchange, investment, disbursement or reinvestment made by wallet users 'at any time' they directed Prime Trust to do so." Compl. at ¶ 29; *see also id*. at ¶ 120(c) ("Defendants were obligated … to return the funds as ordered").

In several instances, the Motion mischaracterizes the Complaint as making unreasonable allegations that it simply does not make. The Motion reads, for example, "Plaintiffs claim that Prime Trust was somehow obligated to have accepted the 'denied' orders and also was obligated to have paid

1   them $1.00 per UST." Mot. at p. 5:16-17. The Complaint makes no such claim. Instead, it claims Prime

2   Trust was obligated to fill Plaintiffs' orders at their value when the orders were placed. *See* Compl. at

3   ¶¶ 6-7, 42, 88. Even the Class definition makes clear that the Class seeks only the value of their

4   investments at the time they placed their orders. *Id*. at ¶ 51 (defining the Class as those whose orders

5   were not filled "at UST's market value at the time [investors' orders] were placed," rather than those

6   whose orders were filled at any value less than $1.00 per UST).

7          Similarly, Prime Trust repeatedly states the "core" of Plaintiffs' claims is that Prime Trust failed

8   to fill Plaintiffs' orders *after* the UST collapsed. Mot. at p. 4:22-5:3; 14:6-7. This is incorrect. The

9   Complaint states Plaintiffs and the class directed Prime Trust to redeem their holdings while UST was

10  still valued as high as $0.90, *before* the UST collapsed. Compl. at ¶ 42 (depositors "placed orders to

11  sell off UST *before* the price fell further" [emphasis added]). Reading the Motion, it would appear

12  Plaintiffs are making an exorbitant and irrational demand. In reality, the Complaint makes no such

13  claim. Plaintiffs acknowledge the UST was an investment instrument and carried with it all attendant

14  risks of investing. One risk they did not assume, however, was that the very custodian that held their

15  asset would simply refuse to redeem it as the asset's value fell.

16          *2)  Prime Trust Incorrectly Argues Factual Allegations Are Missing from the Complaint*

17          In addition to mischaracterizing what *is* in the Complaint, in several instances, Prime Trust

18  mischaracterizes what *is not* in the Complaint, claiming that there are "holes" missing from Plaintiffs'

19  allegations when in fact these missing allegations have nothing to do with the claims in the case.

20          As a primary example, Prime Trust's first argument is that the Complaint fails to plead that

21  Prime Trust played a role in Plaintiffs' decisions to invest in UST. Mot. at p. 1:20-2:5. It argues that

22  the failure to plead "*when* they purchased UST, *how much* they purchased, *what* they paid, *where* and

23  from *whom* they purchased, and *whether* and *why* any of it had to do with Prime Trust" amounts to a

24  fatal deficiency in the Complaint. *Id*. (original emphasis). These facts have nothing whatsoever to do

25  with Plaintiffs' claims against Prime Trust. Plaintiffs' claims against Prime Trust are based on its role

26  as a trust, bank, and custodian that owed specific, fiduciary duties to Plaintiffs to hold their assets in

27  trust and redeem them upon demand. In this respect, it did not matter whether Plaintiffs held UST, gold

28  bullion, or corn futures, let alone when, where, and from whom they bought them.

Similarly, Prime Trust claims the Complaint is deficient because "Plaintiffs do not plead any basis to hold Prime Trust responsible for the UST market collapse." *Id*. at p. 2:6-7. Again, this is completely irrelevant to the claims pleaded in this case. Prime Trust, as the Complaint alleges, accepted Plaintiffs' investment funds to hold in trust (¶ 31), was obligated to execute Plaintiffs' redemption orders upon receiving them (¶ 29), and refused to fill Plaintiffs' redemption orders in a timely manner— or at all (it still has not filled their orders)—at great cost to Plaintiffs (¶ 42). The reasons for the UST's collapse are completely irrelevant to these allegations and it is misleading for Prime Trust to insinuate that a failure to plead such facts renders the Complaint defective.

Lastly, the Motion claims the Complaint is deficient because it fails to allege that Prime Trust was under the "obligation to find a buyer" for Plaintiffs' UST. Mot. at p. 2:14-16. This argument is both inconsistent with the facts pled in the Complaint and immaterial to Plaintiffs' claims. Based on the allegations in the Complaint, which come from Prime Trust's own statements, the reason Prime Trust failed to fill orders was its "liquidity provider" stopped servicing its requests. Compl. at ¶ 47. Finding "buyers" had nothing to do with it. In fact, if one takes Prime Trust's statements at face value, finding buyers in the marketplace is not what Prime Trust does. It is a "bank" (*id*. at ¶ 25) that redeems funds when an investor orders it to do so; it is a "trust" (*id*. at ¶ 26) that ensures digital assets are backed by funds; and it is a "custodian" (*id*. at ¶ 27) that holds funds and allows instant settlement for digital assets. But it is not, and Plaintiff's claims do not require it be, a broker, market maker, or any other financial services company that finds buyers for investment assets.

### III.

### ARGUMENT

#### A.    Standard for a Motion to Dismiss.

A motion to dismiss will be denied if the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (emphasis added). "The plausibility standard is not akin to a probability requirement, but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Id*. The court does not weigh evidence, evaluate witness credibility, or consider the likelihood that a plaintiff will prevail at trial. *Twombly*, 550 U.S. at 556 (holding "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely[.]'").

Dismissals under Rule 12(b)(6), which Prime Trust seeks here, are generally disfavored. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). Dismissals "are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development … since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (citations omitted); see also *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015). Accordingly, "[t]he burden of demonstrating that no claim has been stated is upon the movant." *Glanville v. McDonnell Douglas Corp.*, 845 F.2d 1029 (9th Cir. 1988). Moreover, the allegations in the complaint are construed in the light most favorable to the plaintiff. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).

**B.      The Motion Is Procedurally Improper and Uses Inapplicable Legal Standards.**

*1)   The Motion Introduces Extraneous Evidence that Either Must Be Excluded as Inadmissible or Converts this Motion to Dismiss into a Motion for Summary Judgment*

Prime Trust asks the Court to consider three documents attached to its separately filed motion to strike, claiming they are copies of "User Agreements" between Plaintiffs and Prime Trust. ECF Nos. 29-2, 29-3, & 29-4. It further claims these documents are referenced in the Complaint; yet, as shown above, this is incorrect. Likely recognizing the flimsiness of the argument that the documents are referenced in the Complaint, Prime Trust asks the Court to take judicial notice of the documents. ECF No. 28 at pp. 2-3. For reasons examined more closely in Plaintiffs' opposition to the motion to strike, these are not documents subject to judicial notice. *See, e.g., United States v. Corinthian Colleges*, 655 F.3d 984, 999 (9th Cir. 2011) ("we may not, on the basis of evidence outside of the Complaint, take judicial notice of facts favorable to Defendants that could reasonably be disputed"). Finally, the documents are inadmissible as they are not properly authenticated in Prime Trust's motion to strike. Rather than attach the documents to a competent declaration of a person with knowledge of their

contents or the circumstances of their formation, Prime Trust simply attaches the documents to counsel's declaration and claims they are "true, correct, and authentic copies" of agreements. There is no explanation in the declaration of how counsel knows the documents are authentic or how he knows they constitute validly formed contracts. Produced in this manner, the documents lack proper foundation and are inadmissible under FRE 901. *See, e.g., Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) (excluding records attached to attorney declaration claiming that records are "true and correct copies" as lacking proper foundation).

If, assuming for the sake of argument, the Court considers the documents, this entire Motion is altered. Generally, a motion to dismiss under Rule 12(b)(6) may not introduce evidence that was not included with the plaintiff's complaint. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) ("extraneous evidence should not be considered in ruling on a motion to dismiss"). Only when (1) the complaint refers to the extraneous evidence, (2) the extraneous evidence is central to the plaintiff's claim, and (3) no party questions the authenticity of the extraneous evidence can it be considered by the court in a 12(b)(6) motion. *United States v. Corinthian Colleges*, *supra*, 655 F.3d at p. 999. None of these criteria are met here. If the Court decides to consider these extraneous documents, "the motion to dismiss becomes a motion for summary judgment." *Kalifano, Inc. v. Sierra Health & Life Ins. Co., Inc.*, 2020 WL 1434281, at *2 (D. Nev. Mar. 24, 2020).

The alleged contracts are central to Prime Trust's Motion. Several arguments in the Motion refer to the documents and some are supported *entirely* by citation to the documents, including the argument regarding Plaintiffs' claim for breach of fiduciary duties of a trust. Mot. at pp.14-17. Based on the fact that Plaintiffs plead they had no agreements with Prime Trust and Prime Trust's motions offer next to nothing by way of background regarding the documents, Plaintiffs have no choice but to dispute the documents' authenticity. Plaintiffs have not had the opportunity to conduct discovery necessary to oppose a summary judgment motion based on records they have never seen prior to the filing of the Motion and the notice for the Motion is inadequate under Rule 56. Because the facts necessary to oppose a Rule 56 motion are unavailable to Plaintiffs, the Court should deny this Motion under Rule 56(d) and permit the case to proceed to discovery.

1

2

2) *Prime Trust Asks the Court to Improperly Apply the Heightened Pleading Standard for Fraud Claims to All of Plaintiffs Claims*

3

4

Federal Rules of Civil Procedure, Rule 9(b) imposes a heightened pleading standard for claims grounded in fraud. Where a plaintiff pleads facts indicating a "unified course of fraudulent conduct," the heightened standard applies to all claims related to that unified course. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). In other cases, however, a plaintiff may plead some fraudulent and some non-fraudulent conduct, in which case "only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Id*. at p. 1104; *see also*, Phillips & Stevenson, Federal Civil Procedure Before Trial, Calif. & 9th Cir. Edition (The Rutter Group 2022) ¶ 8:158 ("when the complaint alleges both fraudulent and nonfraudulent conduct, *only the fraud allegations* need be stated with particularity" [original emphasis]).

Here, Prime Trust incorrectly foists the Rule 9(b) requirement on all of Plaintiffs' claims. Mot. at pp. 4:18-19 (applying Rule 9(b) to "the case"), 17:24-27 (applying Rule 9(b) to unjust enrichment claim), 19:7-14 (applying Rule 9(b) to negligence claim). This ignores the plain fact that Plaintiffs allege two distinct patterns of misconduct. First, Plaintiffs allege Prime Trust made claims it would perform certain due diligence activities, like "ensure that the funds are there that back the coin" (Compl. at ¶ 26), which it did not do. Separately, Plaintiffs allege Prime Trust refused to perform its duties as, *inter alia*, a custodian of Plaintiffs' investments and held their assets when Plaintiffs demanded the funds be released. *Id*. at ¶ 42. Plaintiffs concede their allegations dependent on the first pattern of conduct (the basis for Plaintiffs' second cause of action for deceptive trade practices) aver to fraud. But the second pattern of conduct (the basis for Plaintiffs' first, third, fourth, and fifth causes of action) stands as an independent basis of breach. Even if Prime Trust had not made the misleading statements regarding its due diligence, Plaintiffs' claims that it improperly denied them access to their funds would remain viable. Accordingly, only claims for deceptive trade practices in Plaintiffs' second cause of action are subject to the heightened pleading requirement.

**C.    The Complaint Makes Plausible Allegations Prime Trust Is Liable for Its Misconduct.**

The Complaint alleges four causes of action premised on Prime Trust's refusal to fill Plaintiffs' orders to redeem their holdings: (1) breach of fiduciary duty, (2) conversion, (3) unjust enrichment, and

(4) common law negligence. Additionally, it alleges violation of the NDTPA for Prime Trust's false representations and omissions regarding its services. The Complaint clearly and comprehensively alleges Prime Trust's conduct violated its obligations to Plaintiffs, supporting claims for common law and statutory violations element-by-element.

### ***Breach of Fiduciary Duty***

Under Nevada law, a defendant breaches a fiduciary duty when (1) a fiduciary relationship existed between the parties at the time of the alleged misconduct, (2) the defendant had duties within the scope of this relationship to exercise care in its dealings with the plaintiff, (3) the defendant violated that duty; (4) the plaintiff was damaged, and (5) the defendant's acts caused the plaintiff's damages. Nev. Jury Instr. No. 15.7 (citing *Bedore v. Familian*, 122 Nev. 5 (2006)). With respect to claims against financial institutions, courts in this district have found a claim for breach of fiduciary duty can be plausibly alleged where a complaint identifies "policies that defendants neglected to follow and various warnings that defendants ignored …." *F.D.I.C. v. Delaney*, 2014 WL 3002005, at *4 (D. Nev. July 2, 2014).

Prime Trust correctly identifies three bases for Plaintiffs' claim it owed them a fiduciary duty: as a confidant, trustee, and escrow agent. Compl. at ¶ 61-63. Prime Trust is incorrect, however, in claiming none of these three bases apply to establish a fiduciary duty in this case.

Plaintiffs plausibly allege that Prime Trust owed them a fiduciary duty "by virtue of the confidence reposed in [its] integrity." Compl. ¶ 60. Prime Trust contends there is no "act or statement" alleged in the Complaint to support a "confidence theory" of fiduciary duty it is simply incorrect. But this ignores the Complaint's allegations that Plaintiffs deposited financial assets in custodial trust accounts created and controlled by Prime Trust (¶¶ 3, 29) and allowed Prime Trust to directly access funds in their private bank accounts (¶ 24, 30, 31). Prime Trust, meanwhile, "accepted" the deposits of Plaintiffs' assets (at ¶¶ 31, 60), processed their transactions and settlement requests (¶¶ 29, 102), and took funds from and deposited funds into their bank accounts (¶¶ 31, 102). These facts taken in tandem with Prime Trust's marketing and public statements that it is a "trust" and a "type of bank" show a confidential (meaning *of or relating to confidence*, rather than *private*) fiduciary relationship.

The Complaint also plausibly alleges that Prime Trust owed Plaintiffs a fiduciary duty by virtue of its role as a trustee and breached that duty through its misconduct. Compl. at ¶¶ 61, 68-71. The Complaint alleges Prime Trust created trust accounts for Plaintiffs (¶¶ 29, 30), Prime Trust served as trustee of the funds held in the accounts (¶¶ 25, 61, 98, 105), and the purpose of the trust was to process wallet users' digital asset transactions when directed (¶¶ 3, 29). Prime Trust breached its duty as a trustee (and as its other fiduciary duties) by refusing to execute Plaintiffs' transaction orders when the orders were placed, causing Plaintiffs substantial losses and damages. Compl. at ¶¶ 8, 42, 71. As stated above, Prime Trust relies entirely on the inadmissible extraneous documents attached to its Motion to support its arguments that it owed no fiduciary duties as a trustee. Moreover, there is no evidence before the Court that the documents govern the specific trusts at issue in this matter. Any arguments based on these documents should, therefore, be ignored. But even if the Court did admit or judicially notice Prime Trust's documents, and found they constituted valid agreements, and found they governed the specific trusts in this matter, they do not "exculpate" Prime Trust as it claims. The Complaint plausibly alleges that Prime Trust breached the fiduciary obligations of a trustee by refusing to fill Plaintiffs' orders and converting Plaintiffs' assets to its own. There is not a shred of evidence, admissible or otherwise, that would allow Prime Trust impunity for such misconduct.

Finally, the Complaint plausibly alleges that Prime Trust owed Plaintiffs a fiduciary duty as an escrow agent. Compl. at ¶ 62. Prime Trust claims, without citation to any controlling authority,[2] that Plaintiffs' claim is deficient because the Complaint does not identify a "transaction" or an "escrow agreement" where an escrow agent could be engaged. Assuming Prime Trust had met its burden to prove this point, and these elements were necessary under Nevada law, the argument again ignores the facts as pleaded in the Complaint. The Complaint pleads that Prime Trust was in an agreement with wallet services to carry out Plaintiffs' transaction orders (¶ 29), that Prime Trust engaged an "exchange partner" or "liquidity provider" for such transactions (¶¶ 45, 47), and that Plaintiffs specifically placed orders to execute transactions to redeem UST that were routed to Prime Trust (¶¶ 7, 42, 68, 103). Plaintiffs concede that there are various details Plaintiffs are not privy to, such as the details of Prime

---

[2] Prime Trust cites *Horner v. Semenza*, 129 Nev. 1123, at *3 (2013) in support of this argument. Plaintiffs note this is an unpublished case and, according to Nevada Rules of Appellate Procedure, Rule 36(c), "does not establish mandatory precedent."

Trust's agreement with the various wallet services, or who Prime Trust's anonymous "liquidity provider" is. But at the pleadings phase of a case based on novel legal theories such as this one, a plaintiff is not expected to plead every detail necessary to prove their case, only "enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 802–03 (7th Cir. 2008).

### ***Conversion***

"Conversion is a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights." *T1 Payments LLC v. New U Life Corp.*, 2022 WL 195111, at *9 (D. Nev. Jan. 21, 2022) (citing *M.C. Multi-Fam. Dev., L.L.C. v. Crestdale Assocs., Ltd.*, 124 Nev. 901, 910 (2008)).

Plaintiffs' plead facts demonstrating Prime Trust wrongfully exerted dominion over their UST holdings in a manner that violated their title or rights. The Complaint alleges Plaintiffs were the rightful owners of their UST holdings (¶¶ 42, 85), Prime Trust was at all times the custodian of these assets and nothing more (¶¶ 3, 25, 31, 38), Plaintiffs placed orders to redeem their UST that were routed to Prime Trust by way of Plaintiffs wallet services (¶¶ 7, 42), but Prime Trust denied these orders to avert its own losses (¶¶ 7, 42, 43).

The Motion argues Plaintiffs' claim for conversion fails because they "never requested the return of any UST." Mot. at p. 17:15-17. It claims this is required under the holding in *In re W. World Funding, Inc.*, 52 B.R. 743 (Bankr. D. Nev. 1985). In fact, the actual language in the *In re W. World Funding, Inc.* opinion is far softer, reading, "[i]t is often held that a demand and refusal may be necessary to maintain a cause of action for conversion. However, where the conversion is complete without a demand and refusal, those elements are unnecessary." *Id*. at p. 765 (citation omitted). Regardless of how the opinion is interpreted, Plaintiffs do allege they demanded the return of their assets and faced refusal from Prime Trust. The Complaint clearly states Prime Trust took control of Plaintiffs' assets and refused to redeem them upon Plaintiffs' demand. Compl. at ¶¶ 7, 42. Thus, the Motion is incorrect and Plaintiffs' conversion claim is adequately pled.

### *Unjust Enrichment*

The elements of an unjust enrichment claim are "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant; (4) in circumstances where it would be inequitable to retain the benefit without payment." *Smallman v. MGM Resorts Int'l*, 2022 WL 16636958, at *10 (D. Nev. Nov. 2, 2022); *see also Sierra Dev. Co. v. Chartwell Advisory Grp., Ltd.*, 223 F. Supp. 3d 1098, 1107 (D. Nev. 2016) ("[u]njust enrichment occurs when one party confers a benefit on a second party which accepts and retains the benefit under circumstances such that it would be inequitable to retain the benefit without paying for its value"). Under an "additional" restatement of the claim, "unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Leasepartners Corp. v. Robert L. Brooks Tr. Dated Nov. 12, 1975*, 113 Nev. 747, 755 (1997).

The Complaint alleges Prime Trust was unjustly enriched when it held Plaintiffs' assets against their will as the assets' value began to fall. It pleads Plaintiffs conferred a benefit upon Prime Trust by granting it power to take, hold, and transact their assets (¶¶ 30, 31, 38, 92), that Prime Trust benefitted from holding Plaintiffs' assets (instead of redeeming them upon Plaintiffs' demand) because it would have incurred losses by redeeming the assets when Plaintiffs so demanded and avoided those losses by retaining the assets (¶¶ 43, 93, 94), that Prime Trust actively refused to redeem Plaintiffs' assets when faced with demands to do so (¶¶ 42, 94), and equity and good conscience demanded Prime Trust fulfill its duty to redeem the assets when Plaintiffs placed orders to do so (¶ 95).

Prime Trust waves its hand at Plaintiffs' claim for unjust enrichment, arguing that (1) Plaintiffs must plead unjust enrichment to a higher standard because it is "based on fraud," (Mot. at p. 17:24-25) and (2) the benefit Plaintiffs allege was conferred on Prime Trust does not "match" the allegation of Prime Trust's enrichment (*id.* at p. 18:6-8). These arguments are unpersuasive. To begin with, there is no rule that all claims for unjust enrichment sound in fraud. *See*, *e.g. Las Vegas Skydiving Adventures LLC v. Groupon, Inc.*, 2019 WL 5454488, at *5 (D. Nev. Oct. 23, 2019) (denying motion to dismiss unjust enrichment claim without application of the Rule 9(b) pleading standard). Nor does the unjust enrichment claim in this case sound in fraud. None of the allegations satisfying the elements of

1  Plaintiffs' unjust enrichment claim, identified above, depend on or relate to allegations that Prime Trust
2  was fraudulent in the provision of its services.

3          With regard to Prime Trust's second contention, that Plaintiffs' allegation of benefits does not
4  "match" their allegation of enrichment, this is an argument that is unsupported and illogical. The case
5  cited to support the Motion's position here, *Certified Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371,
6  376 (2012), says nothing of "matching" benefits to enrichments. Nor does any case known to Plaintiffs.
7  Regardless, the argument is simply wrong. If Prime Trust had filled Plaintiffs' orders when Plaintiffs
8  made their demands, say for example when UST was valued at $0.90, Plaintiffs only would have lost
9  $0.10 on their investments. Because of Prime Trust's deficient coding, this would have cost Prime Trust
10 to lose that same amount—$0.10. Rather than mitigate the loss to Plaintiffs, Prime Trust refused to
11 redeem their assets in order to save itself from losses. There can be no question this was "retention" of
12 a "benefit" that "belongs to another," satisfying the elements of an unjust enrichment claim.
13 *Leasepartners Corp.*, *supra*, 113 Nev. at p. 755.

14          ***Negligence***

15          Negligence is proven where there is "(1) an existing duty of care, (2) breach, (3) legal causation,
16 and (4) damages." *Turner v. Mandalay Sports Ent., LLC*, 124 Nev. 213, 217 (2008). Of these elements,
17 Prime Trust only challenges Plaintiffs' claim that it owed them a duty of care. Mot. at pp. 18-20. "[A]ll
18 persons in this society have an obligation to act reasonably and ... should be held to the
19 general duty of reasonable care when another is injured." *DeBoer v. Sr. Bridges of Sparks Fam. Hosp.*,
20 128 Nev. 406, 410 (2012) (citing *Moody v. Manny's Auto Repair*, 110 Nev. 320, 332 (1994)).

21          Here, Plaintiffs allege Prime Trust owed them a duty of care based on three theories: affirmative
22 conduct and representations, a special relationship, and bailment. Compl. at ¶ 102. The Motion
23 contends (1) the Complaint fails to adequately allege what duty was created by Prime Trust's
24 affirmative conduct, (2) Prime Trust's misrepresentations cannot serve as the basis for a duty, (3) there
25 is no public policy supporting a finding of duty from a special relationship, (4) duty based on the theory
26 of bailment fails absent allegations Plaintiffs "asked Prime Trust to return" their holdings, and (5)
27 claims of negligence *per se* premised on violations of the NDTPA cannot survive.

28

Prime Trust's first and second arguments both relate to Plaintiffs' allegation that Prime Trust owed a duty through its conduct and statements. Without authority, the Motion claims there is no duty based on its conduct because "[o]ther than allegations that appear to go to their fiduciary duty claim, the Complaint is silent on how or why Prime Trust's conduct purportedly created any duty." Mot. at p. 19:2-4. Plaintiffs know of no reason why and see no authority suggesting that conduct creating a *fiduciary* duty of care would not also create a *general* duty of care. Cases in this District have found both can co-exist, especially at the pleadings stage of a litigation. *See*, *e.g.*, *F.D.I.C. v. Delaney*, *supra*, 2014 WL 3002005 (denying motion to dismiss claims for breach of fiduciary duty and gross negligence). Prime Trust's undeveloped and unsupported argument does not meet its burden to show no claim has been stated and should be disregarded.

Similarly, Prime Trust's argument that it owes no duty based on its representations is without merit. It first contends that alleging a duty based on representations sounds in fraud. But the specific allegations in the Complaint at issue do not plead fraud at all. The Complaint reads,

> "Defendants represented they would take specific actions for the direct benefit of Plaintiffs and members of the Class, including conducting due diligence into the digital assets they transacted and facilitating transactions instantly at any time."

Compl. at ¶ 102(a). While it is correct that Prime Trust failed to live up to the representations referred to here, this allegation has nothing to do with the fraudulence of the statements. The allegation is that Prime Trust stated it would undertake certain actions, thereby creating a duty to do so. Whether it knew that the statements were false when they were made or intended to induce Plaintiffs to act on these statements—the heart of a fraud claim (*Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 447 (1998)—is irrelevant to the allegation that it owed Plaintiffs a general duty. To hold otherwise would mean that all negligence claims premised on a duty undertaken by representations are actually fraud claims subject to Rule 9(b)'s heightened pleading requirement. This is not the law, and Prime Trust offers the Court no support for this position.

Prime Trust's third argument, that there is no public policy supporting a finding of duty where there is a special relationship, is based on unpublished and un-controlling law. *Estrada v. Steam Maxx Carpet & Upholstery Cleaning*, 133 Nev. 1006 (Nev. App. 2017) is an unpublished opinion. Again, unpublished opinions are not binding authority under the Nevada Rules of Appellate Procedure. Even

if *Estrada* were binding authority, it says nothing about Nevada public policy. Moreover, it does nothing to exculpate Prime Trust. Both *Estrada* and the case it relies on for the cited proposition, *Scialabba v. Brandise Const. Co.*, 112 Nev. 965 (1996), hold that a special relationship exists where one party *controls* some aspect of the other's welfare. *Estrada*, 133 Nev. at p. 1006; *Scialabba*, 112 Nev. at p. 969 ("the element of control is the pivotal factor in the determination of liability arising from certain relationships"). Here, the Complaint alleges Prime Trust, not Plaintiffs, had control of Plaintiffs' assets when the UST began to fail. Compl. at ¶¶ 86, 97, 102(b). Under the policy stated in *Scialabba*, this allegation along with the other details of the relationship between Plaintiffs and Prime Trust (*see* Compl. at ¶ 31) are adequate to establish a duty based on a special relationship.

Prime Trust's fourth argument regarding duty under a theory of bailment mirrors another unpersuasive argument the Motion makes regarding Plaintiffs' conversion claim—the Complaint fails to allege that Plaintiffs asked Prime Trust to return control of their assets. As before, the argument is unpersuasive because it incorrect. Even from the most cursory reading of the Complaint, it is evident that the only reason this case was filed was because Plaintiffs demanded Prime Trust redeem their assets so they could get what was left of their money back and Prime Trust refused. Compl. at ¶¶ 7, 42. To say Plaintiffs failed to ask to retake control of their assets is to ignore the entire basis of the case. "A bailment exists when there is a delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose under an express or implied-in-fact contract." *Borenstein v. Animal Found.*, 526 F. Supp. 3d 820, 838 (D. Nev. 2021) (citation omitted). The allegations in the Complaint establish a bailment arrangement where Plaintiffs assets were delivered to Prime Trust (¶¶ 25, 29, 38, 102), Prime Trust held the assets for the purpose of permitting Plaintiffs' transactions (¶¶ 30, 102), and there was no privity between Plaintiffs and Prime Trust (¶ 31). These claims plausibly allege a duty of care created through Prime Trust's bailment relationship with Plaintiffs.

Finally, Prime Trust argues the Complaint fails to plausibly allege negligence *per se* because the laws used as predicates to the theory are themselves inapplicable. The Complaint alleges negligence *per se* under three separate laws: violation of the NDTPA, violation of section 715 of the Uniform Prudent Investor Act (NRS 164.715), and violation of and violation of section 740 of the Uniform

Prudent Investor Act (NRS 164.740). Whether Plaintiffs plausibly allege violations of the NDTPA is discussed in more detail below. Prime Trust's arguments that Plaintiffs fail to plausibly allege violations of the Uniform Prudent Investor Act are thin and unpersuasive. As argued above, the Complaint adequately alleges the Parties created a trust because Prime Trust created trust accounts for Plaintiffs (¶¶ 29, 30), it held their funds "in trust" (¶¶ 25, 61, 98, 105), and there was a specific purpose for the trust (¶¶ 3, 29). The extraneous documents on which Prime Trust relies to argue it did not violate the terms of the trust are inadmissible and should be excluded from the Motion. But even if they are considered, they do not allow Prime Trust to unilaterally refuse to fill Plaintiffs' orders and convert Plaintiffs' assets to its own. Prime Trust's contention that the Complaint fails to plausibly allege negligence *per se* under these laws, therefore, should be denied.

### ***Deceptive Trade Practices***

"[T]he NDTPA is a remedial statutory scheme that should be afforded a liberal construction." *Leigh-Pink v. Rio Properties, LLC*, 138 Nev. Adv. Op. 48 (2022). Plaintiffs plead violations of the NDTPA in relation to Prime Trust's claims that it would "back" stablecoins such as UST and that it "instantly" processed investor orders. Compl. at ¶¶ 79, 80. It also alleges Prime Trust "withheld, omitted, and concealed" information material to its relationship with Plaintiff, including:

> "the deficiencies in [its] systems that would prevent [it] from executing transactions ordered by Plaintiffs or members of the Class, and withholding the delegation to third parties [the so-called "liquidity partners"] of responsibilities that were critical to the objectives of Plaintiffs and members of the Class."

*Id*. at ¶¶ 70, 81. It goes on to plead that if Plaintiffs knew that Prime Trust's systems would not execute their transactions "in a timely and effective manner, they would not have agreed to give control of their funds to Defendants." *Id*. at ¶ 97; *see also id*. at ¶ 83 (Prime Trust's misrepresentations and omissions were "a cause and a substantial factor in bringing about Plaintiffs' harm").

Prime Trust devotes the lion's share of its Motion to the argument that the Complaint fails to plead facts necessary to establish liability under the NDTPA. But it only argues that its affirmative misrepresentations do not give rise to a claim. Under NRS 598.0923, knowingly *failing to disclose* a material fact in connection with the sale or lease of goods or services constitutes a deceptive trade practice. Compl. at ¶ 77. The Motion makes *no argument whatsoever* regarding the Complaint's

1  allegation that its omissions violated the NDTPA, thus that argument is waived. The case Prime Trust

2  primarily relies on for its support, *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168

3  (D. Nev. 2021), involved no allegations of a failure to disclose, and is not on point. Thus, Prime Trust

4  fails to meet its burden to show the Complaint fails to plausibly allege a violation of the NDTPA.

5  **D.     The Nature of Plaintiffs' Claims Are Novel, Deserving Development of a Factual Record.**

6          Many of Plaintiffs' allegations in this case are cast in uncharted legal waters. Prime Trust is a

7  "bank for digital assets," which is itself a novel form of finance. Compl. at p. 5. The assets at issue in

8  this case defy traditional legal classifications and, accordingly, the contentions of legal liability that

9  apply to Prime Trust and Plaintiffs' conduct are murky. For example, Plaintiffs' allegation that Prime

10  Trust owes a fiduciary obligation as a confidant, trustee, or escrow agent have, to Plaintiffs' knowledge,

11  never been applied to any institution in the FinTech industry. The Ninth Circuit rule for such cases is

12  to allow additional latitude at the pleadings stage. *McGary*, *supra*, 386 F.3d at p. 1270; *see also*, *Zurich*

13  *Am. Ins. Co. v. Aspen Specialty Ins. Co.*, 2021 WL 3489713, at *4 (D. Nev. Aug. 6, 2021) (declining

14  to dismiss claims for equitable subrogation where there was uncertainty regarding the how the elements

15  of the claim applied). Accordingly, the Motion should be denied and Plaintiffs should be permitted to

16  develop their theories through a factual record rather than the supposition of pleadings.

17  **E.     Should the Court Grant Any Part of the Motion, Plaintiffs Request Leave to Amend.**

18          If the Court is inclined to grant Prime Trust's Motion, there are several reasons it should grant

19  Plaintiffs leave to amend. First and foremost, the Motion attached documents claiming to be agreements

20  between Plaintiffs and Prime Trust that Plaintiffs had never seen. This would be in line with the Ninth

21  Circuit's "generous" policy allowing leave to amend, especially where there are no prior amendments.

22  *United States v. Corinthian Colleges*, *supra*, 655 F.3d at p. 995.

23  / / /

24

25  / / /

26

27  / / /

28

1

2

## IV.

## CONCLUSION

Prime Trust's Motion is factually inconsistent, procedurally defective, and fails to meet the burden on a Rule 12(b)(6) motion. For these and all other foregoing reasons, Plaintiffs request the Court deny Prime Trust's Motion to Dismiss in its entirety.

DATED this 24th day of February, 2023.

**KEMP JONES, LLP**

*/s/ Mona Kaveh*
Michael Gayan, Esq. (#11135)
Mona Kaveh, Esq. (#11825)
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Julie Erickson (*pro hac vice pending*)
Elizabeth Kramer (*pro hac vice pending*)
Kevin Osborne (*pro hac vice pending*)
**ERICKSON KRAMER OSBORNE LLP**
44 Tehama Street
San Francisco, CA 94105

*Attorneys for Plaintiffs and the putative class*

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on the 24th day of February, 2023, I served a true and correct copy of the

3

foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

4

**COMPLAINT [ECF NO. 30]** via the United States District Court's CM/ECF electronic filing system

5

to all parties on the e-service list.

6

Mitchell J. Langberg, Esq. (NVBN 10118)

7

Eric D. Walther, Esq. (NVBN 13611)
**BROWNSTEIN, HYATT, FARBER, SCHRECK, LLP**

8

100 North City Parkway, Suite 1600
Las Vegas, NV 89106

9

10

Jonathan A. Shapiro, Esq. (*admitted pro hac vice*)
**GOODWIN PROCTER LLP**

11

Three Embarcadero Center, 28th Floor
San Francisco, CA 94111

12

13

Aaron S. Thompson, Esq. (*admitted pro hac vice*)
Natalie Garson, Esq. *(admitted pro hac vice)*

14

**GOODWIN PROCTER LLP**
520 Broadway, Suite 500

15

Santa Monica, CA 90401

16

*Attorneys for Defendant Prime Trust LLC*

17

18

  */s/ Ali Lott*
An employee of Kemp Jones, LLP

19

20

21

22

23

24

25

26

27

28